**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-7394

CARNELL DRAUGHN, JR.,

Petitioner - Appellee,

versus

GENE M. JOHNSON, Acting Director of the
Virginia Department of Corrections,

Respondent - Appellant.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk. Rebecca Beach Smith, District
Judge. (CA-02-646-2)

Argued: September 29, 2004          Decided: January 14, 2005

Before WILLIAMS, KING, and DUNCAN, Circuit Judges.

Reversed by unpublished per curiam opinion.

**ARGUED:** Donald E. Jeffrey, III, Assistant Attorney General, OFFICE
OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for
Appellant. G. Arthur Robbins, CHESAPEAKE MERIDIAN, Annapolis,
Maryland, for Appellee. **ON BRIEF:** Jerry W. Kilgore, Attorney
General of Virginia, Richmond, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

PER CURIAM:

Gene M. Johnson, Acting Director of the Virginia Department of Corrections (the state),[1] appeals the district court's conditional grant of Carnell Draughn's § 2254 petition for writ of habeas corpus. The district court ruled that Draughn's trial counsel rendered ineffective assistance of counsel because, during a motion to withdraw from the case, he revealed confidential client communications. Specifically, Draughn's counsel informed the trial court that Draughn wanted to move for the trial judge's recusal on the ground that the judge was biased against African-Americans. In the opinion of the district court, counsel's behavior failed the standard set by Strickland v. Washington, 466 U.S. 668 (1984), and the state habeas court was objectively unreasonable in concluding otherwise. Because, even assuming Draughn's counsel was constitutionally deficient, Draughn cannot show that his counsel's actions resulted in actual prejudice, we reverse the conditional grant of Draughn's § 2254 petition.

---

[1]At the time Draughn filed his habeas corpus petition in the Virginia courts, Ronald Angelone was the named respondent. (J.A. at 260.) Gene Johnson was substituted as the named party when Draughn filed his § 2254 petition in the district court. (J.A. at 347.) To remain consistent, the opinion refers to "the state" as the party in interest.

At approximately 8:40 p.m. on the evening of March 31, 1997, an African-American male entered a Blockbuster Music store in Newport News, VA.  The individual approached the front register, placed his hand on the counter, and told the employee working at the register, William Workinger, that he had "30 mother-f***king seconds to clear that register before I pop a cap in your ass." (J.A. at 39.)  After Workinger removed the cash from the front register and then opened the next register for the individual only to find that it was empty, the individual ordered Workinger to take him to the room where the night deposit was kept.  Workinger and the individual went to the back of the store and knocked on the door where Heather Shaffer, another employee, was putting together the night deposit.  Workinger told Shaffer to open the door because there was a problem.  Shaffer did so, and the individual stood in the doorway and told Shaffer that she had "20 mother-f***king" or "15 mother-f***king seconds to put the money in the bag."  (J.A. at 45, 68.)  Shaffer complied, turning over somewhere between $1500.00 and $2000.00 to the individual.  The individual then had Workinger follow him to the door.  Once outside, the individual ran towards a Firestone Tire establishment.

Workinger testified that the individual was approximately his height, around 5'7" to 5'9", and that the individual had a mustache but no other facial hair.  Shaffer testified that the robber was

also about 5'7", the same height as Workinger.[2] Workinger initially told police that the robber was wearing a black baseball cap, but he testified at trial that the individual was wearing a black stocking cap. Workinger blamed the discrepancy on the fact that he first thought the robber was simply wearing a baseball cap with the bill turned backwards. In contrast, Shaffer testified that the individual wore a baseball cap with the bill in front. Both Workinger and Shaffer testified that the individual wore a dark, bulky jacket, and that the robber did not produce a gun but kept his right hand in his jacket pocket, where there was a noticeable bulge.

After the robbery, Workinger immediately called the police, who responded within five minutes. Later that evening, at approximately 1:00 a.m., the police showed Workinger a page from a high school yearbook and asked Workinger if he could identify the individual who robbed the Blockbuster. Workinger, after four or five minutes, picked out Carnell Draughn as the robber. Several days later, the police showed Shaffer a spread of approximately ten photos and she also picked Carnell Draughn as the robber.

On the basis of these eyewitness identifications, the Commonwealth of Virginia indicted Draughn on June 9, 1997, for two counts of robbery and two counts of use of a firearm during the

---

[2]Draughn is approximately six feet tall and testified that he had a full beard as of March 31, 1997. (J.A. at 115.)

commission of a felony. A one-day bench trial was conducted on January 28, 1998 in the Circuit Court for the City of Newport News (trial court). Draughn took the stand in his own defense, maintaining his innocence. He testified that he and a friend went to the Blockbuster Music at 8 p.m., he had left the store shortly thereafter, and he was on the telephone with two female acquaintances at the time the robbery took place. Draughn also testified that, while driving his friend home between 10:30 p.m. and 11:00 p.m., he passed the Blockbuster Music but did not notice any police vehicles there. Draughn had earlier told police, however, that he passed the Blockbuster Music after the robbery and saw the police cars in front of the store. The trial court found Draughn guilty on all counts.

On April 21, 1998, following Draughn's conviction but prior to his sentencing, Draughn moved for a new trial based on newly discovered evidence. In support of this motion, Draughn argued that Workinger testified falsely at trial when he stated that he had never seen Draughn before that evening. Draughn presented evidence that he and Workinger had attended the same high school and that Draughn was a well-known basketball star at the school. The trial court heard arguments on the motion on April 21, 1998, and at one point stated, "if that's the only thing you base it on, I'm prepared to go forward with sentencing." (J.A. at 162.) Draughn's counsel, Larry King, continued pressing the matter,

5

however, and the trial court then stated, "I'll give you an opportunity to get him in here to testify whether or not he knew him or not . . . but I think the testimony would reveal he just simply said he had not seen him previously."  (J.A. at 163-64.) The case was continued to June 10, 1998, for further consideration of Draughn's motion for new trial.

In the interim, however, Draughn requested that King withdraw as his counsel.  On May 21, the trial court held a hearing on King's motion to withdraw.  During that hearing, the following exchange took place:

> **The Court**: Give this Court, whoever wants to testify, give me a reason why you should withdraw or why I should allow you to withdraw, then I'll do it.
> **Mr. King**: I think some of the reasons would be prejudicial to Mr. Draughn if I tell the Court some of the reasons.
> **The Court**:  Well, I have a decision right on my desk that came in yesterday that says allowing withdrawal is within the discretion of the Court and unless you give me a reason to allow you to withdraw, I'm not going to do it.
> **Mr. King**: First of all, they want a guarantee I can win the case.
> **The Court**: Go ahead.
> **Mr. King**: Secondly, they question the Court's prejudicial attitude towards black defendants.  They want me to press that matter.

(J.A. at 172.)

The trial court denied the motion to withdraw but permitted Draughn to have substitute counsel appear on record at the motion for new trial and sentencing.  (J.A. at 175.)  During that hearing, the trial court also reversed its earlier ruling that Draughn could

6

question Workinger during the hearing on the motion for a new trial.[3]  Instead, the trial court said, "I am not going to extend this case now for additional evidence. . . .  This is not new, something new that he couldn't have produced at the time of trial." (J.A. at 174.)

At the hearing on the motion for a new trial, the trial court did not permit Draughn to question Workinger.  The court explained, "I made it plain to Mr. King when he came before me that I would not hear any further evidence in this case."  (J.A. at 181.)  "I told you you could put it on the record for whatever good, but I was not going to hear the evidence."  (J.A. at 181.)  "I am not reopening this case for a new trial.  There is no new evidence that's been presented to the Court."  The trial court did permit Draughn's new counsel to proffer, for the record, that Workinger was one year ahead of Draughn in high school, and that Draughn was well known in high school because he was a standout basketball player.[4]   Counsel also proffered that a different Blockbuster Music was robbed the day before the one in question by an individual also wearing  a black jacket and black baseball cap;

---

[3]At the beginning of the hearing on the motion for a new trial, the trial court ruled that the motion would be limited to the question of whether another individual had, in fact, confessed to the crime.  Counsel for both parties then reminded the trial court that the individual who "confessed" was in jail at the time of the robbery.

[4]The high school Draughn and Workinger attended had approximately 2,000 students.

7

although Draughn's photograph was shown to eyewitnesses to that crime, the did not identity Draughn as the perpetrator.  The trial court denied the motion for a new trial and later sentenced Draughn to a total of ten years imprisonment.[5]

Draughn appealed the denial of the motion for new trial, but the Court of Appeals of Virginia affirmed the trial court's ruling, finding that the evidence Draughn proffered during that motion failed to meet the standard for granting a motion for a new trial. The Supreme Court of Virginia declined to hear Draughn's direct appeal.

On July 25, 2000, Draughn filed a petition under Virginia law for habeas corpus in the state habeas court.[6]  Draughn contended that King provided ineffective assistance of counsel by (1) failing to advise him of his right to a jury trial; and (2) mishandling the motion for withdrawal by violating Draughn's attorney-client privilege.  The state filed a motion to dismiss the petition, arguing that Draughn could not meet either prong of the Strickland

---

[5]Draughn's sentence was imposed as follows: 3 years imprisonment for the first use of firearm during the commission of a felony conviction; 5 years for the second firearm conviction; and 15 years each, suspended to one year, for the two robbery counts. The sentences ran concurrently, resulting in a total of ten years imprisonment.  The trial court also ordered Draughn to pay $3,600.00 in restitution to Blockbuster.

[6]Draughn's petition for writ of habeas corpus in Virginia was heard by the trial court.  For ease of nomenclature, we will refer to the trial court as the "state habeas court" when referencing its analysis of Draughn's habeas corpus petition.

v. Washington, 466 U.S. 668 (1984) test.  Included with the motion to dismiss was an affidavit from King.  King stated that, following the trial "Mr. Draughn and his father began expressing views regarding a corrupt and biased judge, police department, witnesses, and criminal justice system." (J.A. at 280.)  According to King, Draughn and his father "wanted me to ask [the trial judge] to remove himself from the case because of the trial judge's alleged prejudicial beliefs against African-American defendants." (J.A. at 281.)  After King refused to make such a motion, "Mr. Draughn, and his father, told me to withdraw from the case.  I explained to Mr. Draughn that, at that stage, the court would require good reason for me to withdraw.  Mr. Draughn told me to do what was necessary to withdraw from his case, and that he would find another lawyer to do things his way." (J.A. at 281.)

The state habeas court heard arguments on Draughn's habeas corpus petition on September 27, 2001.  Following oral argument, that court dismissed Draughn's petition "for the reasons stated in the motion to dismiss." (J.A. at 306.)  On July 18, 2002, the Supreme Court of Virginia summarily declined to hear Draughn's appeal.

Following the exhaustion of his state court remedies, on August 14, 2002, Draughn filed a 28 U.S.C.A. § 2254 petition in the United States District Court for the Eastern District of Virginia,

reasserting his ineffective assistance of counsel claims.[7] Draughn's § 2254 petition was referred to a magistrate judge, who, on June 10, 2003, issued a report and recommendation concluding that Draughn's § 2254 petition should be granted as to the claim that King was constitutionally deficient in handling the motion to withdraw from the case because the disclosure of Draughn's confidential conversations "fell below the range of competence that the United States Constitution demands." (J.A. at 401.) The magistrate judge found that Draughn suffered actual prejudice because, following the denial of the motion to withdraw, the trial court reversed its earlier ruling and refused to permit Draughn to question Workinger as part of his motion for a new trial. The magistrate judge's report concluded that "[t]he findings and statements by the state court judge gave the appearance of anger and support Draughn's contention that the state court judge became hostile and did not properly consider his post trial motion." (J.A. at 404.) Accordingly, in the magistrate judge's view, Draughn established that "the outcome of his motion for a new trial

---

[7]Draughn raised a total of three ineffective assistance of counsel claims. The magistrate judge recommended denying the § 2254 petition as to the first two claims, and the district court adopted that recommendation. In addition, the district court then declined to grant Draughn a certificate of appealability (COA) as to those claims. Draughn failed to request a COA in this court as to those two claims, so the denial of relief on those claims is not before us. See Manokey v. Waters, No. 03-6932 (4th Cir. Dec. 2, 2004) (holding that a habeas petitioner must obtain a COA before an appellate court can review alternate theories supporting a grant of habeas relief.)

and sentencing <u>may</u> have been different." (J.A. at 404) (emphasis added). To remedy the ineffective assistance of counsel, the magistrate judge recommended a conditional grant of habeas corpus requiring Virginia to appoint a new state trial judge to hear Draughn's motion for new trial.

The state filed objections to the magistrate judge's report, and on August 5, 2003, the district court adopted the magistrate judge's recommendation conditionally granting Draughn's § 2254 petition. The state filed a notice of appeal on September 3, 2003, and we have jurisdiction under 28 U.S.C.A. § 1291.[8]

II.

We review de novo the district court's decision to grant a habeas petition based on a state court record, applying the same standards as the district court. <u>Whittlesey v. Conroy</u>, 301 F.3d 213, 216 (4th Cir. 2002). Pursuant to the Anti Terrorism and Effective Death Penalty Act of 1996, the scope of our review, and that of the district court, is highly constrained. Under 28 U.S.C.A. § 2254(d)(1), we may grant a petition for habeas corpus, with respect to any claim adjudicated on the merits in state court,

---

[8]Because the state, and not the habeas petitioner, is appealing the ruling of the district court, we do not require a certificate of appealability. <u>See</u> Fed. R. App. P. 22(b)(3) ("A certificate of appealability is not required when a state or its representative or the United States or its representative appeals.")

11

if the state court decision was contrary to clearly established federal law or the decision was an unreasonable application of federal law as determined by the Supreme Court.

A decision of a state court is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).[9] A state court adjudication is an unreasonable application of federal law when "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The state court's application of clearly established federal law must be "objectively unreasonable," and "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

Although the state habeas court did not offer an independent rationale in denying Draughn's habeas corpus petition, that court's ruling is still "an 'adjudication' of the merits of the claim and must be reviewed under the deferential provisions of 2254(d)(1)."

---

[9]Draughn does not suggest that the state habeas court's decision was contrary to clearly established federal law.

12

<u>Bell v. Jarvis</u>, 236 F.3d 149, 158 (4th Cir. 2000) (en banc). "In such cases, we conduct an independent examination of the record and the clearly established Supreme Court law, but we must still confine our review to whether the court's determination resulted in a decision that . . . involved an unreasonable application of[] clearly established Federal law." <u>Id.</u> (internal citations and quotation marks omitted).

Draughn's § 2254 petition alleged that his counsel provided ineffective assistance, in violation of his Sixth Amendment rights. Under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), a criminal defendant must make two showings to prove that his counsel's deficient performance deprived the defendant of his Sixth Amendment right to counsel.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Id.</u> at 687.

We do not address whether Draughn's counsel's performance was deficient because we hold that, even assuming King's representation

13

was constitutionally deficient, Draughn cannot prove that counsel's errors resulted in actual prejudice.[10]

The <u>Strickland</u> Court explained that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." <u>Strickland</u>, 466 U.S. at 693. Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> In making that determination, courts must "presume . . . that the judge or jury acted according

---

[10]<u>Strickland</u> permits reviewing courts to address the prejudice prong of the inquiry first in appropriate cases. <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984) ("[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.") We briefly note, however, that it is not at all clear that the state habeas court was objectively unreasonable in concluding that Draughn's counsel was not constitutionally deficient. First, Draughn's principal argument is that King's performance was deficient because he violated Virginia's Professional Code of Responsibility by revealing a confidential communication. <u>See</u> Rules of the Supreme Court of Virginia, Pt. 6 § II Canon 4 (1997). The Supreme Court has cautioned "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee." <u>Nix v. Whiteside</u>, 475 U.S. 157, 165 (1986). "[A] court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct." <u>Id.</u> Furthermore, the alleged confidence, that Draughn believes the trial judge was biased, was communicated to King with the intent that it would be disclosed in open court as a motion requesting the trial judge's recusal. Thus, it is far from clear that King revealed a confidential communication to the court.

14

to law." Id. Thus, to prevail under this prong of Strickland, Draughn must show at least that, but for King's disclosure, there was a reasonable probability that the trial court would have granted the motion for a new trial.[11] And, in order to grant Draughn's habeas petition, we must find that the state habeas court was objectively unreasonable in concluding otherwise.

Applying this deferential standard of review, we conclude that the state habeas court was not objectively unreasonable in finding that Draughn did not suffer any prejudice, because the trial court's ruling on the motion for a new trial was correct as a matter of Virginia law.

Under Virginia law, motions for new trial based upon newly discovered evidence are "not looked upon with favor" and are "awarded with great reluctance." Odum v. Commonwealth, 301 S.E.2d 145, 149 (Va. 1983). The defendant

> bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

Id. at 149.

---

[11]The state argues that Draughn was not prejudiced because Draughn cannot show either a reasonable probability that the motion for a new trial would have been granted or that Draughn would have prevailed at a new trial. We need not decide which is the proper "proceeding" with the meaning of Strickland because Draughn cannot show a reasonable probability that the motion for a new trial would have been granted but for King's performance.

15

Draughn cannot show a reasonable likelihood that the trial judge would have granted the motion for a new trial but for King's performance because Draughn's evidence fails to meet the standard announced above. The evidence Draughn wished to press as newly discovered, that Workinger and Draughn attended the same high school and that another Blockbuster was robbed the night before, fails at least the second, and arguably the fourth, requirement under Odum. That was the conclusion drawn by the Court of Appeals of Virginia on Draughn's direct appeal. Evidence that Workinger and Draughn attended the same large high school could have been discovered prior to trial with reasonable diligence, especially given that Draughn's high school record and athletic prowess were mentioned several times during the trial. Moreover, it is not clear that the evidence was of the type that should change the result at trial. At most, the fact that the two attended the same high school permits the impeachment of Workinger's statement that he had never seen Draughn before. It does not mean that Workinger did not see Draughn that evening in the store. Such evidence also does not cast doubt on Shaffer's positive identification of Draughn. Likewise, evidence that another Blockbuster was robbed the night before by an individual wearing a black jacket and baseball cap also could have been discovered by diligence before trial and, again, does not tend to disprove that Draughn robbed the Blockbuster in question.

Thus, even assuming King was deficient in handling the motion to withdraw, Draughn cannot show that he was prejudiced by the deficiency because the trial judge's ruling on the motion for new trial was <u>correct</u>. There is no reasonable probability that, but for King's errors, the result of the motion for new trial would have been different.

The district court concluded that the trial judge's anger with Draughn after the motion to withdraw was denied met the <u>Strickland</u> prejudice inquiry. The district court's approach presupposes the inability of trial judges to separate personal feelings from their judicial duties. We will not lightly assume that a trial judge, faced with an allegation of racial bias, will shirk his duties to apply the law to the case before him. As the record here indicates, the trial judge performed his duties properly in refusing to grant Draughn's motion for a new trial on the basis of newly discovered evidence.[12]

III.

The decision of the district court, conditionally granting Draughn's § 2254 petition, is reversed.

<u>REVERSED</u>

---

[12]We further note that the trial court sentenced Draughn to a total of two years imprisonment out of a possible thirty years on the robbery counts – hardly the picture of a vindictive judge.